Brandon H. Brown (SBN 266347)
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
Telephone: (415) 439-1400
Email: bhbrown@kirkland.com

Gregory S. Arovas (*pro hac vice* forthcoming)
Todd M. Friedman (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Email: greg.arovas@kirkland.com
Email: todd.friedman@kirkland.com

Edward C. Donovan (*pro hac vice* forthcoming)
Stephen C. DeSalvo (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 389-5000
Email: edward.donovan@kirkland.com
Email: stephen.desalvo@kirkland.com

David Rokach (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
333 W Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Email: david.rokach@kirkland.com

*Attorneys for Samsung Plaintiffs*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. and SAMSUNG RESEARCH AMERICA <br><br> Plaintiffs, <br><br> v. <br><br> ZTE CORPORATION <br><br> Defendant. | CASE NO. _____ <br><br> **COMPLAINT FOR BREACH OF CONTRACT, VIOLATION OF SECTION 2 OF THE SHERMAN ACT, AND VIOLATION OF SECTION 17200** <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA") and Samsung Research America ("SRA") (collectively "Samsung") seek a judgment against ZTE Corporation ("ZTE") that ZTE breached its contractual undertakings to license to Samsung certain patents on fair, reasonable, and non-discriminatory ("FRAND") terms, violated Section 2 of the Sherman Act, and violated Cal. Bus. & Prof. Code § 17200, as set forth below.

## NATURE OF THE ACTION

1.      This action arises from ZTE's contractual commitments to license patents essential to industry standards, such as cellular communication standards, on FRAND terms.  Rather than honor these contractual commitments, ZTE has launched a campaign of aggressively pursuing excessive royalties from industry participants.

2.      Both ZTE and Samsung have been involved in technical work relating to development of the 4G Long Term Evolution ("4G") and 5G New Radio ("5G") standards for cellular communications.  Samsung's pioneering efforts in this work have led to numerous U.S. patents held by Samsung relating to the 4G and 5G standards, as well as development of a wide range of other technology used in Samsung's mobile communication products.  ZTE has also submitted declarations asserting that it holds patents allegedly essential for the 4G and 5G standards.

3.      Samsung is a leading innovator in developing consumer and commercial products that practice the 4G, 5G, and other industry standards together with a vast array of other technology that is distinct from these standards.  For example, Samsung's pioneering development of industry leading smartphone technology relating to industrial design, cameras, touchscreens, software, and other features has been widely recognized and has led to significant commercial success of Samsung products relative to numerous other less successful products that practice the same industry standards.

4.      Samsung and ZTE previously engaged in lengthy, substantive discussions regarding a patent license.  Despite non-FRAND demands and conduct by ZTE at that time, the parties were ultimately able to reach mutually agreed upon payment terms in a July 2021 license.

5.      During the past years, ZTE has experienced a decline in its product business, especially in the United States where ZTE was found to have engaged in trade and security misconduct.  For example, in March 2017, ZTE pleaded guilty to violating trade sanctions by exporting U.S. technology

1  to Iran and North Korea, and was fined $1.19 billion by the Department of Commerce. Further,

2  following adoption of the Secure Equipment Act of 2021, in November 2022, the Federal

3  Communications Commission banned certain ZTE products from the U.S. marketplace for national

4  security reasons.

5          6.      In an apparent response to its declining product business in the United States and

6  elsewhere, ZTE has sought to unfairly compensate itself through further pursuit of its aggressive and

7  unreasonable patent licensing campaign. Through this campaign, ZTE is attempting to appropriate

8  for itself the benefit of innovations by other companies who participate in the product marketplace,

9  such as Samsung, by demanding excessive royalties for licensing patents that ZTE contends are

10  essential to industry standards.

11          7.      The unfair and unreasonable nature of ZTE's conduct is illustrated by the inconsistency

12  of ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████          The unfair and

16  unreasonable nature of ZTE's conduct is further illustrated by its practice of repeatedly divesting

17  patents subject to FRAND commitments to non-practicing entities for purposes of assertion against

18  product companies who remain targets for ZTE's own licensing assertions as well, thus exposing such

19  companies to multiple sources of risk and payment demands in order to drive up the overall price in

20  violation of FRAND commitments.

21          8.      ZTE has also acted unreasonably in resisting Samsung's efforts to obtain FRAND

22  licensing terms. ZTE has ████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  leaving the door open to seek injunctions against Samsung's product sales. ZTE has also sought to

25  obstruct Samsung's effort to obtain a neutral determination of FRAND terms through rate setting by

26  the UK High Court—and has specifically refused to enter into a license agreement at the royalty rates

27  that will be set in the first-filed action before the UK High Court, despite acknowledging jurisdiction

28

COMPLAINT                                        2                          CASE NO. _____

by the UK High Court over the parties' patent licensing dispute.  Instead, ZTE has pursued a redundant and improper second-filed global rate setting action in China.

9.      ZTE has further engaged in non-FRAND conduct by seeking patent infringement injunctions against Samsung in multiple forums, after Samsung committed to binding, neutral adjudication of rate-setting in both ███████ and in the UK High Court.  In particular, ZTE has sought injunctions against Samsung products through lawsuits filed in the Unified Patent Court, Germany, and most recently in Brazil and China.  These injunction actions were brought by ZTE without first complying with its FRAND obligations and ZTE has refused to refrain from pursuing injunctions against Samsung products in view of pendency of the UK rate setting action.  Indeed, these injunctions actions serve no legitimate purpose and are instead aimed at seeking unfair leverage to pressure Samsung into accepting ZTE's non-FRAND conduct, including with regard to U.S. SEPs.

10.      ZTE's unreasonable conduct violates the contractual undertakings it made as a participant in cellular standards bodies.  Participants in such standards bodies are required to submit a contractual undertaking to license "essential" patents on FRAND terms.  ZTE has submitted such undertakings, for which Samsung is an intended third-party beneficiary.  ZTE has breached these contracts via its demands for excessive royalties from Samsung, divestment scheme, obstruction of neutral resolutions of FRAND terms, pursuit of an improper second-filed global rate setting action in China, improper pursuit of patent infringement injunction actions as a means of seeking unfair leverage over Samsung, and related unfair and unreasonable conduct.  ZTE has also committed antitrust violations through submission of deceptive FRAND licensing declarations to ETSI in connection with standard setting activities.

11.      As noted above, in an effort to resolve the parties' dispute over FRAND licensing terms and to avoid further harm, Samsung has sought a judicial resolution by the UK High Court regarding global FRAND terms for a license between the parties.  While the UK action addresses FRAND "rate-setting," this action is directed to seeking redress for the harm suffered by Samsung as a result of ZTE's non-FRAND conduct.  Samsung therefore brings this action to seek redress for this harm, and to prevent further harm from misconduct by ZTE, including to Samsung's related business operations in this District.

**PARTIES**

12.     Samsung Electronics Co., Ltd. is a Korean corporation with its principal place of business at 129 Samsung-ro, Maetan-dong, Yeongtong-gu Suwon-si, Gyeonggi-do 16677.  SEC is involved in design, development, manufacturing, and distribution of a range of products, including products that implement industry standards for which ZTE has refused to provide licenses on FRAND terms.

13.     Samsung Electronics America, Inc. is a New York corporation with its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660.  SEA is involved in, sales, marketing, distribution, and commercialization of products that implement industry standards for which ZTE has refused to provide licenses on FRAND terms.

14.     Samsung Research America is a California corporation with its principal place of business at 665 Clyde Ave, Mountain View, CA 94043.  SRA is involved in research and development activities for Samsung products, including in connection with the standards at issue in this case for which ZTE has refused to provide licenses on FRAND terms.

15.     On information and belief, ZTE Corporation is a Chinese corporation with its principal place of business at ZTE Plaza, Keji Road South, Hi-Tech Industrial Park, Nanshan District, Shenzhen, P.R. China.

**JURISDICTION & VENUE**

16.     This Court has subject matter jurisdiction over Samsung's antitrust claim under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.  The Court further has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy as the federal claim and arise from a common nucleus of operative facts.

17.     This Court has personal jurisdiction over ZTE because ZTE has purposefully directed activities or transactions to this forum, has performed acts purposefully availing itself of the privilege of conducting activities in this forum relating to the subject matter of this case, and has engaged in misconduct having foreseeable effect in this forum.  ZTE purports to hold hundreds of U.S. patents that it contends are essential to industry standards and which are the basis for its excessive demands for licensing based on, in part, the activities of Samsung in this District.  Upon information and belief,

COMPLAINT                                                                           CASE NO. _____

ZTE has supervised, coordinated with, and/or directed the activities of personnel in California in connection with developing and asserting the patent portfolio and excessive payment demands at issue in this case. Numerous patents that ZTE has declared as essential to 4G and/or 5G cellular standards were prosecuted on ZTE's behalf, in furtherance of the misconduct by ZTE at issue in this case, by attorneys located in California. Multiple patents that ZTE has declared as essential to 4G and/or 5G cellular standards were developed and invented, in furtherance of the misconduct by ZTE at issue in this case, by technical personnel located in California. Technical personnel located in California have also participated in 3GPP standard setting activities on behalf of ZTE, likewise in furtherance of the misconduct at issue. Further, upon information and belief, ZTE has directed communications and assertions to multiple companies located in this District relating to the 4G and/or 5G patents at issue in this case and relating to its efforts to obtain excessive royalties for licensing its patents, including for example Apple. ZTE's communications and assertions to Samsung, which relate to multiple Samsung entities, likewise are directed at business conducted in this District, including the headquarters of SRA. Upon information and belief, each of the acts noted above was conducted in connection with ZTE's plan of pursuing non-FRAND conduct and excessive royalty demands from industry participants for patents allegedly essential to industry standards in violation of ZTE's deceptive commitments to license the 4G and 5G patents at issue on FRAND terms, which is the subject matter of this case. Further, ZTE's conduct has caused injury to Samsung in this District, including impact upon business activities centered in this District.

18.    The Court further has personal jurisdiction over the antitrust claims against ZTE based upon its national contacts with the United States, pursuant to 15 U.S.C. § 22. ZTE's activities relating to enforcement, prosecution, and development of 4G and 5G SEPs have been directed to California, as set forth above, as well as to additional areas in the United States. Further, upon information and belief, ZTE's global patent-related activities during at least a portion of the time period at issue in this case were directed by personnel located in the United States, including for example Mang Zhu.

19.    Venue is proper in this District pursuant to at least 28 U.S.C. §1391(b)(2) and (c)(3) and pursuant to 15 U.S.C. § 22.

**DIVISIONAL ASSIGNMENT**

20.    For purposes of intradistrict assignment under Civil Local Rules 3-2(c) and 3-5(b), this case involves an antitrust claim and is subject to district-wide assignment.

**BACKGROUND**

**SSOs & Industry Standards**

21.    In order to ensure that cellular mobile handsets and network equipment made by multiple manufacturers can work together, industry participants collaborate to develop standards that define protocols for communication between these devices.  One of the primary organizations involved in such standard setting is the European Telecommunications Standards Institute ("ETSI"), which helped produce the 4G and 5G standards, as well as certain 3G and 2G cellular communication standards.   ZTE and Samsung are both members of ETSI.   Multiple other standard setting organizations produce other standards relevant to Samsung's products.

22.    Standards are beneficial because compliance with a given set of standards by all industry participants ensures that devices made by any company in the world can communicate with each other because all devices speak the same "language."  This allows consumers to have confidence that cellular mobile devices bought from numerous manufacturers will work with cellular networks and with other cellular mobile devices.  Once a standard is adopted, compliance with the standard is mandatory for any company seeking to produce standard-complaint devices.

23.    Certain risks to manufacturers arise when companies claim to have patents that are "essential," or required, for compliance with industry standards.  Such patents are known as standard essential patents ("SEPs").  In some instances, companies who propose and lobby for incorporating certain protocols in the standard-setting process are also the holders of patents they allege are SEPs.

24.    Manufacturers are thus at risk of being targeted with patent infringement assertions based on their use of public industry standards if those standards are allegedly covered by patents. This situation becomes particularly problematic when patent holders seek excessive royalty payments and seek to "hold-up" industry participants, who have no choice but to use the protocols specified in the standards—regardless of the extent to which any such technology allegedly covered by a particular patent is inherently valuable or useful.

25.    This also causes a potential conflict of interest within the standard-setting process, where participants may second-guess the motivation of a company that proposes the use of a particular protocol in the standard. Such proposals for inclusion of material into the standard may be motivated by the proposing company's desire to assert that it holds SEPs covering such technology.

26.    In an attempt to address the problems noted above, standard-setting organizations typically adopt patent policies that govern licensing of SEPs. In particular, ETSI has adopted an Intellectual Property Rights ("IPR") Policy, incorporated as Annex 5 of the ETSI Rules of Procedure. The ETSI IPR Policy contractually requires members to disclose SEPs and to submit an IPR Information Statement and Licensing Declarations ("IPR Declaration"), under which Clause 6.1 calls for declarants to make contractual commitments to "grant irrevocable licen[s]es on fair, reasonable and non-discriminatory ('FRAND') terms and conditions." A copy of the ETSI IPR Policy is attached as Exhibit 1.

27.    ZTE has submitted numerous IPR Declarations to ETSI with regard to patents relating to cellular communication standards formulated by ETSI, including 5G, 4G, 3G, and 2G, which contractually commit to "grant irrevocable licenses under its/their IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy." Each of these IPR Declarations is a contract between ZTE and ETSI, with Samsung (and others) as an intended third-party beneficiary. An exemplary IPR Declaration of ZTE is attached as Exhibit 2. In return for submitting declarations, ZTE is permitted to participate in ETSI standard setting and to have its technical contributions and technology potentially related to its patents considered for incorporation into ETSI standards. As such, ZTE is contractually obligated to grant licenses to Samsung, an intended third-party beneficiary of the IPR Declarations in accordance with the ETSI IPR policy, on FRAND terms for SEPs relating to these communication standards. This includes an obligation to act in good faith in connection with licensing the declared patents.

**ZTE's Market Power Regarding Technology Incorporated Into Standards**

28.    Cellular communication standards, such as 4G and 5G, are formulated through the work of technical committees or other types of working groups, comprised of representatives of ETSI members. The committees consider submissions of technical materials, known as standards

contributions, that collectively contain multiple alternative protocols, technologies, or approaches for implementing particular features sought to be incorporated into the standard. ZTE describes itself as a major contributor and participant in the standard-setting process for cellular standards and purports to have submitted many thousands of technical contributions during the ETSI standard-setting process.

29.    For purposes of evaluating the anticompetitive effect of ZTE's conduct at issue in this action, the relevant markets are the markets for input technologies comprising subject matter allegedly covered by ZTEs patents together with the alternative technologies to ZTE's patents that could have been used in the cellular standards—before adoption of the standards—to perform standardized functionality allegedly covered by ZTE's SEPs ("Standardized Technology Markets"). The functionality for cellular communication standards provided by the subject matter of each Standardized Technology comprises an independent relevant market for antitrust purposes. For example, competing standards contributions by other members of ETSI are reasonable substitutes for subject matter of contributions submitted by ZTE (including such technology allegedly covered by ZTE SEPs), because each of these alternatives are capable of performing the relevant functionality of the standard. However, once the standard is adopted, formerly reasonable substitutes are no longer available because implementation of technical subject matter chosen for inclusion in the standard is required for standards-compliant products and thus companies producing such standards-compliant products are locked in to use the required technology. ZTE therefore obtained a monopoly over the relevant Standardized Technology Markets for which it allegedly holds SEPs. Cellular communication standards are implemented throughout the world and standards contributions are submitted by companies around the world. The geographic scope of the Standardized Technology Markets is therefore global.

30.    As a result of inclusion into cellular communications standards of technical subject matter allegedly covered by ZTE SEPs, ZTE has the power to take advantage of the effect of locking in that technical subject matter, such as by raising prices and excluding competition with respect to each of the protocols or technologies that is covered by its SEPs and was incorporated into the standards. As set forth below, ZTE acquired that power improperly as a result of its misconduct, including deceptive submission of false FRAND commitments to ETSI. Barriers to entry into the

Standardized Technology Markets are high because other technologies are no longer viable substitutes after particular technologies were chosen for inclusion in the standard and potential re-formulation of standards is a difficult, time-consuming process—which continues to grow more difficult as further investments continue to be made in producing and rolling out products compliant with existing standards.  ZTE therefore holds monopoly power in the Standardized Technology Markets allegedly covered by ZTE SEPs.  Such monopoly power and misconduct by ZTE is further compounded by ZTE's requests for injunctive relief against Samsung products, and implicit threat of further such requests in the future, to the extent Samsung does not agree to the excessive payment demands asserted by ZTE as a result of its market power.

31.    As noted above, ETSI seeks to address issues of this nature by conditioning its consideration of technical material for incorporation into standards, including consideration of ZTE's technical contributions relative to alternative technologies contributed by other standard-setting participants, on the provisions of the ETSI IPR Policy requiring FRAND licensing commitments.  In particular, ETSI relies upon FRAND licensing commitments in order to select and lock in technical subject matter for inclusion in standards instead of selecting competing alternative technologies.

32.    If a FRAND commitment is not available, the IPR Policy permits ETSI to change the standard to avoid the SEP in question.  Clause 8 of the ETSI IPR Policy addresses steps for avoiding incorporating into standards technology for which licenses are not available on FRAND terms as well as steps for mitigating the harm resulting from previous incorporation into standards technology for which it subsequently turns out that licenses are not available on FRAND terms.  For example, Clause 8.1.3 states as follows: "Prior to any decision by the General Assembly, the COMMITTEE should in consultation with the ETSI Secretariat use their judgment as to whether or not the COMMITTEE should pursue development of the concerned parts of the STANDARD or a TECHNICAL SPECIFICATION based on the non-available technology and should look for alternative solutions."  As a further example, Clause 8.2 provides, in part, that when "in respect of a published STANDARD or TECHNICAL SPECIFICATION, ETSI becomes aware that licen[s]es are not available from an IPR owner in accordance with Clause 6.1 above" steps taken by ETSI can include that a "vote shall be taken in the General Assembly on an individual weighted basis to immediately refer the

1    STANDARD or TECHNICAL SPECIFICATION to the relevant COMMITTEE to modify it so that

2    the IPR is no longer ESSENTIAL."

3                          **ZTE's Deceptive FRAND Commitments**

4        33.    During the course of the past years, ZTE has continuously committed to ETSI that

5    licenses for SEPs held by ZTE would be available on FRAND terms.  For example, ZTE submitted

6    dozens of FRAND commitments to ETSI during the past year, including for example a November 26,

7    2024 FRAND licensing declaration submitted by Mr. Guanglei Chen, IPR Director at ZTE, with

8    regard to various patents allegedly essential to the 5G cellular communication standard.

9        34.    ZTE submitted its FRAND commitments to ETSI after ZTE was already asserting non-

10   FRAND positions and ███████████████████████████████████████

11   with Samsung, as well as after ZTE's non-FRAND conduct in the previous licensing discussions

12   leading to the 2021 agreement.  ZTE also submitted its FRAND commitments to ETSI after ZTE had

13   already embarked upon its patent divestment scheme, for example after ZTE's September 25, 2020

14   patent assignment to G+ Communications LLC and ZTE's December 21, 2022 patent assignment to

15   Advanced Standard Communication LLC.

16       35.    Upon information and belief, ZTE submitted FRAND licensing declarations to ETSI

17   while knowing that it would fail to comply with its FRAND licensing obligations.  ZTE's deceptive

18   FRAND commitments would be expected to mislead, and have in fact misled, ETSI and the public

19   when they acted reasonably by relying on ZTE's FRAND commitments in connection with selecting

20   technology for incorporation into standards and thus foregoing selection of reasonable alternative

21   technologies that were available at the time, such as standards contributions of companies other than

22   ZTE.

23                          **Parties' Previous License Agreement**

24       36.    Samsung and ZTE previously entered into a license agreement in July 2021 ("2021

25   Agreement").

26       37.    The 2021 Agreement was entered into following extensive, substantive licensing

27   discussions.  Samsung and ZTE ultimately mutually agreed upon licensing and payment terms

28   regarding the patent portfolios covered by the agreement.

**ZTE's Divestment of Patents**

38.     ZTE has engaged in multiple rounds of divesting patents subject to FRAND commitments to non-practicing entities, who have in turn asserted these patents against product companies who remain targets for ZTE's licensing demands as well.  Upon information and belief, these activities are conducted pursuant to a scheme and/or coordination between ZTE and the non-practicing entities in question.

39.     ZTE's divestment scheme serves to expose product companies to multiple sources of risk and payment demands, instead of the single source of risk and demands that existed while the patents were held by ZTE.  This scheme serves to unfairly drive up the overall price of a license to the overall portfolio in violation of FRAND commitments.

**ZTE's Breach of FRAND**

40.     ZTE has publicly stated that it seeks to generate extensive revenue from patent licensing, particularly with regard to cellular standard essential patents.  This strategy has been reflected in ZTE's conduct, which has become increasingly aggressive and unreasonable in connection with improper attempts to pressure Samsung to pay excessive royalties.

41.     Samsung, on its own behalf and behalf of its worldwide affiliates, has engaged in ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Despite repeated efforts by Samsung to ████ ████████████████████████████████████████████ ZTE has engaged in non-FRAND conduct, including insisting upon excessive royalty payments that are not FRAND and that are inconsistent with the mutually agreed terms in the parties' previous agreement.  ZTE has also unreasonably obstructed Samsung's efforts to obtain a neutral resolution of the parties' disputes ████████████ and through rate setting by the UK High Court—and has specifically refused to enter into a license agreement at the royalty rates that will be set in the first-filed action before the UK High Court, despite acknowledging jurisdiction by the UK High Court over the parties' patent licensing dispute.  Instead, ZTE has pursued a redundant and improper second-filed global rate setting action in China.  ZTE has further engaged in non-FRAND conduct by pursuing patent infringement injunctions against Samsung in the Unified Patent Court, Germany, and most recently in Brazil and

China, after Samsung committed to binding, neutral adjudication of rate-setting in both ███████ and in the UK High Court. ZTE has refused to refrain from pursuing injunctions against Samsung products in view of pendency of the UK rate setting action. These injunction actions improperly serve as a means for ZTE to seek unfair leverage to pressure Samsung into non-FRAND terms for licensing the SEPs at issue, including pressure to pay non-FRAND terms for licensing U.S. SEPs allegedly practiced by Plaintiffs. ZTE's scheme to exert improper pressure on Samsung through injunction actions has already resulted in entry of preliminary injunctive relief against Samsung in Brazil based on purported SEP infringement.

## CLAIMS FOR RELIEF

### COUNT I

### (Breach of Contract)

42.     Samsung repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

43.     ZTE's IPR Declarations to ETSI contractually bind ZTE to license SEPs and to act in good faith regarding such licenses, including for cellular communication standards such as 5G and 4G, to Samsung as an intended third-party beneficiary, on FRAND terms. Companies whose business activities involve standardized products and technologies, such as Samsung, are intended third-party beneficiaries of ZTE's contractual commitments and are entitled to enforce these contracts.

44.     As set forth above, ZTE has breached its contractual FRAND obligation in connection with licensing patents that ZTE contends are SEPs for the 5G and 4G standards, including for example through failure to provide FRAND licensing terms in response to Samsung's requests, demands for excessive royalties from Samsung, divestment scheme, obstruction of neutral resolutions of FRAND terms, pursuit of a redundant and improper second-filed global rate setting action in China, improper pursuit of patent infringement injunction actions as a means of seeking unfair leverage over Samsung, and related unfair and unreasonable conduct. ZTE's lack of compliance with FRAND licensing obligations can be analyzed with respect to multiple factors including, for example, guidance provided by the parties' 2021 Agreement, with reference to the FRAND royalty rates that will be set by the UK High Court, and in connection with multiple instances of unfair and unreasonable conduct.

45.     As a result of ZTE's breaches, Samsung has been injured, including through expenditure of personnel time and resources to deal with ZTE's unreasonable conduct, being subjected to uncertainty over obtaining licenses and being subjected to pressure through improper demands for injunctive relief – which impacts the business activities of Samsung relating to the technology and products incorporating standardized cellular technology.  This injury is likely to continue absent relief from the Court.  Samsung may be further injured by additional breaches of contract by ZTE in connection with the foregoing and other potential non-FRAND conduct.

46.     Samsung is therefore entitled to compensatory damages, regarding instances of harm for which such damages can reasonably be determined, resulting from ZTE's breach of contract.

47.     Samsung is further entitled to specific performance, to remedy instances of harm that cannot be reasonably compensated through monetary damages and for which they are subject to irreparable injury, including via an order compelling ZTE to negotiate in good faith in accordance with criteria required by ZTE's FRAND obligations and to refrain from conduct that is inconsistent with ZTE's obligations.

## COUNT II

### (Declaratory Judgment)

48.     Samsung repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

49.     In view of ZTE's conduct, there is a concrete and immediate controversy regarding the requirements of good faith in connection with negotiating and resolving the parties' dispute regarding licensing for the 5G and 4G patents.  A judicial declaration under 28 U.S.C. § 2201 is necessary and appropriate so that Samsung may ascertain its rights regarding licensing these patents.

50.     Samsung is entitled to a declaration that ZTE breached its FRAND obligations by failing to offer licenses on FRAND terms and regarding the criteria and conduct required for compliance with ZTE's good faith obligation.

COMPLAINT

CASE NO. _____

**COUNT III**

**(Violation of Section 2 of the Sherman Act)**

51.     Samsung repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

52.     ZTE has unlawfully monopolized multiple Standardized Technology Markets (defined above) by deceptively committing to license SEPs on FRAND terms while intending not to honor this commitment, including in view of the conduct described above.  ZTE has engaged in this misconduct, upon information and belief, with the intent to monopolize the Standardized Technology Markets.

53.     The ETSI IPR Policy contains provisions (in Clauses 8.1 and 8.2) for excluding technology from standards, both before and after adoption of a standard, in instances where a license to patents covering such technology is not available on FRAND terms.  Upon information and belief, had ZTE disclosed its true intent to ETSI instead of submitting deceptive FRAND commitments, ETSI would have chosen to standardize alternative technologies to perform the relevant functionality, would have replaced standardized subject matter with alterative technology, or would have removed the relevant functionality from the standard for the time being, allowing implementers to choose among these alternative technologies, in accordance with the ETSI IPR Policy.  ZTE therefore would not have a monopoly in the Standardized Technology Markets but for the misconduct in question.

54.     ZTE acted deceptively by continuously committing to ETSI that licenses for SEPs held by ZTE would be available on FRAND terms despite knowing that this commitment was false.  This includes FRAND commitments submitted by ZTE in connection with the 5G standard during the past year, after ZTE was already asserting non-FRAND positions and ███████████████ ███████████████████████████ with Samsung, as well as FRAND commitments submitted after ZTE's non-FRAND conduct in the parties' previous licensing discussions leading to the 2021 agreement, and as well as FRAND commitments submitted after ZTE embarked upon its patent divestment scheme.  Upon information and belief, ZTE submitted FRAND licensing declarations to ETSI while knowing that it would fail to comply with its commitments.

55.     ZTE's deceptive FRAND commitments would be expected to mislead, and has in fact misled, ETSI and the public when they acted reasonably by relying on ZTE's FRAND commitments

in connection with selecting technology for incorporation into standards, maintaining technology in the standards, and foregoing selection of reasonable alternative technologies that were available at the time, such as standards contributions of companies other than ZTE, as well as investing in producing products compliant with the standards.  ZTE's deceptive FRAND commitments proximately resulted in incorporation into and maintenance in cellular communication standards of technology that is allegedly covered by SEPs held by ZTE and by entities to whom ZTE divested SEPs.  ZTE therefore has unlawfully excluded competing technologies from the Standardized Technology Markets and unlawfully acquired monopoly power in those markets.  It was ZTE's willful misconduct, rather than any alleged superior product, business acumen, or historic accident, that led to this monopoly power.

56.     Samsung has suffered injury, and is threatened with imminent further injury, as a direct and proximate result of ZTE's monopolization.   In its role as a consumer in the Standardized Technology Markets for technology incorporated into Samsung products, Samsung has suffered anticompetitive injury because substitutable alternative technologies have been improperly excluded. This has resulted in difficulty in obtaining license rights, higher costs for licenses to Samsung and the industry, loss of personnel time spent dealing with improper assertions, and the prospect of injunctive relief if Samsung does not concede to ZTE's unreasonable demands.  Samsung may be further injured by additional anticompetitive conduct by ZTE.  The injury to Samsung is likely to continue, including irreparable injury that cannot be reasonably compensated through monetary damages, absent relief from the Court.

## COUNT IV

### (Violation of Section 17200)

57.     Samsung repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

58.     ZTE's conduct in connection with its failure to offer licenses on FRAND terms, its patent divestment scheme, and its program of extracting excessive royalty payments from the industry constitute unfair and/or fraudulent business acts or practices under Cal. Bus. & Prof. Code § 17200.

59.     Once technology covered by a patent is adopted into and maintained in industry standards, such as 4G and 5G, the patent owner obtains market power by virtue of the requirement for

the industry to implement the technology in question in order to produce and use products that comply with the standard. More specifically, ZTE has market power in each of the markets comprising subject matter allegedly covered by ZTE's SEPs together with the alternative technologies to ZTE's patents that could have been used in the cellular standards—before adoption of the standards—to perform standardized functionality allegedly covered by ZTE's SEPs. ETSI and the public therefore rely upon FRAND licensing commitments to formulate standards with particular content, to maintain the content of those standards, and to invest in producing products compliant with those standards, as set forth above.

60.     ZTE acted fraudulently by continuously committing to ETSI that licenses for SEPs held by ZTE would be available on FRAND terms. This includes declarations submitted by ZTE in connection with the 5G standard in the past year, during the course of ███████████████, as well as licensing declarations submitted after ZTE's non-FRAND conduct in the parties' previous licensing discussions leading to the 2021 agreement, and as well as licensing declarations submitted after ZTE embarked upon its patent divestment scheme. Upon information and belief, ZTE submitted FRAND licensing declarations to ETSI while knowing that it would fail to comply with its FRAND licensing obligation and would seek to extract excessive royalty payments from Samsung and from other companies. Upon information and belief, ZTE's fraudulent conduct would be expected to mislead, and has in fact misled, ETSI and the public when they act reasonably by relying on ZTE's FRAND commitments in the manner noted above.

61.     ZTE also acted unfairly by virtue of the misconduct discussed above, which at a minimum, violates the policy and spirit of antitrust laws through unfairly obtaining market power by virtue of having technology allegedly covered by ZTE patents incorporated into and maintained in industry standards, such as 4G and 5G, through deceptive conduct. This conduct harms Samsung and the public and injures marketplace competition by, at a minimum, avoiding incorporation of alternative technologies into the standards and instead driving up the price of standards-compliant products and raising the specter of injunctions under ZTE's patent assertions. Upon information and belief, this harm is not outweighed by any justification on the part of ZTE, which merely seeks to unethically inflate the royalty payments it receives for licensing its patents.

62.     As a result of ZTE's misconduct, Samsung has been injured, including through increased cost for patent licensing, and through being subjected to uncertainty over obtaining licenses and potentially being subject to improper demands for injunctive relief – which impacts the business activities of Samsung, including such activities in California, relating to the technology and products at issue in this case.  This injury is likely to continue absent relief from the Court.

## **PRAYER FOR RELIEF**

Samsung respectfully requests the following relief:

A.     That the Court enter judgment that ZTE breached its ETSI contractual obligations regarding licensing patents ZTE contends are SEPs for cellular communication (4G and 5G) standards on FRAND terms;

B.     That the Court award damages regarding instances of harm for which such damages can reasonably be determined, resulting from ZTE's breach of contract;

C.     That the Court compel specific performance of ZTE's contractual obligations, including by requiring ZTE to proceed with licensing discussions in accordance with such obligations and to refrain from conduct that is inconsistent with ZTE's obligations;

D.     That the Court enter judgment that ZTE violated Section 2 of the Sherman Act, including through its submission of deceptive FRAND commitments to ETSI;

E.     That the Court award treble damages regarding instances of harm for which damages can reasonably be determined, resulting from ZTE's anticompetitive conduct;

F.     That the Court enjoin ZTE, its agents, and entities acting in concert with ZTE from further anticompetitive conduct;

G.     That the Court enter judgment that ZTE breached Section 17200;

H.     That the Court preliminarily and permanently enjoin ZTE, its agents, and entities acting in concert with ZTE from engaging in conduct that violates ZTE's contractual obligations and that violates Section 17200 in connection with licensing patents ZTE contends are SEPs for cellular communication standards;

I.     That the Court award Samsung its attorneys fees and costs pursuant to 15 U.S.C.

§ 15(a); and

J.      That the Court award Samsung any and all other relief to which Samsung may show itself to be entitled and that the Court may deem just, equitable, and proper.

## **JURY DEMAND**

Samsung demands a jury trial on all issues and claims so triable.

1    DATED:  February 25, 2025                    Respectfully submitted,

2                                                */s/ Brandon H. Brown*

3                                                Brandon H. Brown (SBN 266347)
                                                 KIRKLAND & ELLIS LLP
4                                                555 California Street, 27th Floor
                                                 San Francisco, CA 94104
5                                                Telephone: (415) 439-1400
                                                 Email: bhbrown@kirkland.com
6
                                                 Gregory S. Arovas (*pro hac vice* forthcoming)
7                                                Todd M. Friedman (*pro hac vice* forthcoming)
                                                 KIRKLAND & ELLIS LLP
8                                                601 Lexington Avenue
                                                 New York, NY 10022
9                                                Telephone: (212) 446-4800
                                                 Facsimile: (212) 446-4900
10                                               Email: greg.arovas@kirkland.com
                                                 Email: todd.friedman@kirkland.com
11
                                                 Edward C. Donovan (*pro hac vice* forthcoming)
12                                               Stephen C. DeSalvo (*pro hac vice* forthcoming)
                                                 KIRKLAND & ELLIS LLP
13                                               1301 Pennsylvania Avenue NW
                                                 Washington, DC 20004
14                                               Telephone: (202) 389-5000
                                                 Facsimile: (202) 389-5200
15                                               Email: edward.donovan@kirkland.com
                                                 Email: stephen.desalvo@kirkland.com
16
                                                 David Rokach (*pro hac vice* forthcoming)
17                                               KIRKLAND & ELLIS LLP
                                                 333 W Wolf Point Plaza
18                                               Chicago, Illinois 60654
                                                 Telephone: (312) 862-2000
19                                               Facsimile: (312) 862-2200
                                                 Email: david.rokach@kirkland.com
20
                                                 *Attorneys for Samsung Plaintiffs*
21

22

23

24

25

26

27

28

COMPLAINT                                                              CASE NO. _____